IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**DANA THOMAS,**

       *Plaintiff*,

v.

**THE PETTIEST OFFICER
ORGANIZATION LLC and BRETT
MICHAEL CARRIER,**

       *Defendants*.

**Civil Action No.:**

_____

**Jury Trial Demanded**

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff Dana Thomas, by and through undersigned counsel, hereby sues defendants The Pettiest Officer Organization LLC and Brett Michael Carrier for cause, claims damages, and states as follows:

### <u>PARTIES</u>

1.      Plaintiff Dana Thomas is a citizen and resident of Fairfax County, Virginia.

2.      Defendant The Pettiest Officer Organization LLC ("The Pettiest Officer") is a Nevada limited liability company that operates multiple Facebook pages, including "The Pettiest Officer of the U.S. Coast Guard," "The Pettiest Officer," and "The Pettiest Officer Organization," and the website pettiestofficer.org. Upon information and belief, The Pettiest Officer's principal place of business is located at 270 7th Street, Apt 2, Leominster, Massachusetts 01453.

3.      Defendant Brett Michael Carrier is a managing member of The Pettiest Officer. Upon information and belief, Defendant Carrier is domiciled at 270 7th Street, Apt 2, Leominster, Massachusetts 01453.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a) because the parties are citizens of different states and the amount in controversy

exceeds $75,000.00.

5.      This Court has personal jurisdiction over Defendants pursuant to Federal Rule of

Civil Procedure 4(k)(1) and Virginia Code § 8.01-328.1(A).

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the

events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

**A. *Plaintiff Thomas's subordinate made false allegations of sexual assault against her in retaliation for Plaintiff Thomas confronting the subordinate regarding numerous reports of performance issues from her staff and Plaintiff Thomas's suspicion that the subordinate had a substance abuse disorder.***

7.      Plaintiff Thomas received her Doctor of Medicine and Master of Public Health

degrees from the George Washington University School of Medicine and Public Health in 1998.

She completed her residency at the Naval Aerospace Medical Institute in 2003. She is board

certified in Aerospace and Occupational Medicine. She completed the Epidemic Intelligence

Service Fellowship with the Centers of Disease Control in 2014 and received her Master of

Health Care Delivery Science from Dartmouth College in 2024.

8.      From March 2019 until her Change of Watch on July 2, 2024, Plaintiff Thomas

served as the Assistant Commandant for Health, Safety, and Work-Life for the United States

Coast Guard. She fulfilled this capacity as a Rear Admiral and Assistant Surgeon General in the

United States Public Health Service ("USPHS"), retiring from service on September 1, 2024.

9.      As the Chief Medical Officer of the Coast Guard, Plaintiff Thomas was

responsible for developing healthcare policy and programs that served 50,000 Active Duty and

Reserve service members, 150,000 family members, 9,000 civilian employees, and 25,000 Auxiliarists. As the Chief of Safety, Plaintiff Thomas was responsible for operational and off-duty mishap prevention, response, and investigation. As the Chief of Work-Life, she oversaw a portfolio of twenty statutorily mandated programs including the Coast Guard's Child Development Services, Culinary Services ashore and afloat, Employee Assistance, Substance Abuse, Health Promotion, and Sexual Assault Prevention, Response, and Recovery ("SAPRR") programs.

10.    At the end of February 2024, Plaintiff Thomas became aware of various complaints about one of her subordinates, Lindsay Charles, who was the SAPRR Oversight & Policy Office Chief.

11.    Upon the departure of one of Ms. Charles's subordinates, Kirsten Diller, in February 2024, Ms. Diller asked to meet with Plaintiff Thomas to discuss her concerns regarding Ms. Charles.

12.    Ms. Diller revealed to Plaintiff Thomas numerous performance issues regarding Ms. Charles, including but not limited to Ms. Charles' inability to attend meetings prior to 10:00 a.m.; repeatedly announcing to her staff on a Thursday or Friday that she would be taking "sick" leave the following Monday; and generally exhibiting poor judgment and lack of leadership.

13.    Also in February 2024, Plaintiff Thomas received an email from another of Ms. Charles's subordinates, Michelle Underwood, echoing many of the same concerns regarding Ms. Charles's behavior.

14.    In February or March 2024, Harold Price, Executive Director of the Coast Guard's Health, Safety, and Work-Life Service Center, informed Plaintiff Thomas that many of the field Sexual Assault Response Coordinators ("SARCs"), who were responsible for executing

the SAPRR policies that Ms. Charles implemented, were threatening to leave due to a loss of confidence in Ms. Charles's leadership.

15.    SARCs serve as the primary point of contact for individuals affected by sexual assault within the Coast Guard. They provide support and advocacy for victims of sexual assault by coordinating medical treatment, facilitating referrals, providing information on reporting options, and ensuring that victims understand their rights and choices. SARCs manage and train teams of professional and volunteer Victim Advocates. They lead prevention efforts across the service by increasing awareness of the role of positive culture and climate, e.g. through Bystander Intervention Training.[1] Thus, the simultaneous departure of multiple SARCs would have serious negative consequences for the entire Coast Guard and its SAPRR program.

16.    In March 2024, Plaintiff Thomas and her then-acting deputy, Rear Admiral Shane Steiner, who is also a USPHS physician, met with Ms. Charles to discuss Ms. Charles's leadership and management issues and the negative effect that they were having on her staff. Plaintiff Thomas articulated the impact that these issues were having on personnel turnover, specifically involving those whom Ms. Charles had hired: In addition to Ms. Diller, Dr. Garland-Jackson, Dr. Scotti Veale, and Captain Lori Mathieu had stated that they refused to continue to work for Ms. Charles. Ms. Underwood, whom Plaintiff Thomas had hired prior to hiring Ms. Charles, had also requested reassignment because of Ms. Charles's conduct. Nearly all of the personnel within the SAPPR Office had indicated by words or actions that it was an unprofessional environment and that Ms. Charles was causing harm to the workplace and to them personally.

---

[1] *See Sexual Assault Prevention, Response, and Recovery (SAPRR) Program*, U.S. Coast Guard (April 2023) at 1-8 through 1-12, https://www.dcms.uscg.mil/Portals/10/CG-1/cg111/docs/SAPR/CI_1754_10F.pdf?ver=fRvWb0wuCQ5gE1FPZ1--Jw%3D%3D.

17.     Thirty minutes into the meeting, Plaintiff Thomas requested that her acting deputy leave the meeting so that she could speak with Ms. Charles privately regarding a sensitive health matter. Using her best supervisory and medical judgment, Plaintiff Thomas asked Ms. Charles directly whether her performance issues could be related to substance abuse.

18.     Ms. Charles was visibly upset by Plaintiff Thomas's suggestion of substance abuse, but acknowledged that she had been drinking more as of late. Ms. Charles was in tears and inconsolable. Ms. Charles denied using substances other than alcohol, primarily wine, and asserted that she mostly drank at home, i.e., she did not admit to a history of drinking and driving. She expressed surprise that anyone would be able to identify potential substance abuse or misuse on her part.

19.     Plaintiff Thomas was bound by her Hippocratic Oath to approach the subject of substance abuse with Ms. Charles and recommend that she seek a professional evaluation for a condition that could have serious consequences for herself, the community, and the service. As Plaintiff Thomas was not Ms. Charles's physician, she was not in a position to diagnose or treat Ms. Charles. As her supervisor, Plaintiff Thomas assured Ms. Charles that she would have the support needed for reasonable accommodations (for example, time off for in-patient or intensive out-patient treatment and rehabilitation).

20.     In or around April 2024, Ms. Charles told Ms. Underwood about the one-on-one meeting that she had with Plaintiff Thomas in March. Ms. Charles further told Ms. Underwood that she believed she was "in a lot of trouble" and that she planned to file a sexual assault complaint against Plaintiff Thomas in response. At the time, Ms. Underwood did not believe that Ms. Charles was serious about filing a complaint against Plaintiff Thomas.

21.     During April 2024, Ms. Underwood and the newest SAPPR hire, Megan Lee,

both continued to express to Plaintiff Thomas their concerns regarding Ms. Charles's judgment and behavior. Their complaints ranged from Ms. Charles publicly berating her staff, to her failure to obtain consent prior to interviewing Coast Guard sexual assault survivors for public affairs videos, to providing copies of said videos to each of the survivors and telling them that the videos are theirs to do with as they choose (when the videos were in fact property of the Coast Guard), to chronic lack of punctuality and professionalism while working with the Department of Defense ("DoD") Sexual Assault Prevention and Response Office during a temporary duty assignment at Ft. Leavenworth, Kansas that spring.

22.    On May 8, 2024, Plaintiff Thomas reported to Dr. Mischell Navarro, Deputy Assistant Commandant for Human Resources and Acting Chief of Military Personnel, her loss of confidence in Ms. Charles and requested to initiate a procedure to place Ms. Charles's credentials in abeyance while an investigation proceeds. At the time, Dr. Navarro had removed Ms. Charles from her position as a hiring official for personnel for vacancies in the Coast Guard SAPRR program due to inappropriately promising upgrades to existing staff. In support of her request to place Ms. Charles's credentials in abeyance, Plaintiff Thomas provided Dr. Navarro with examples of Ms. Charles's concerning behavior.

23.    Also in May 2024, during a regularly scheduled monthly meeting between Plaintiff Thomas and her Senior Rater,[2] Vice Admiral Paul Thomas,[3] Deputy Commandant for Mission Support, Plaintiff Thomas informed Vice Admiral Thomas that she had written a letter of reprimand for Ms. Charles, based on the concerns raised by Ms. Diller, Ms. Underwood, Ms. Lee, and Dr. Felicia-Garland Jackson, as well as Plaintiff Thomas's own observations.

---

[2] The civilian equivalent to a "Senior Rater" is a next-level/final-level supervisor.

[3] There is no familial relation between Plaintiff Thomas and Vice Admiral Thomas.

24.     Vice Admiral Thomas instructed Plaintiff Thomas not to release the letter of reprimand of Ms. Charles, as he believed that it would be seen as an act of retaliation for an Inspector General complaint that Ms. Charles had filed against Plaintiff Thomas, which was then being investigated by the Coast Guard Investigative Service ("CGIS"). This conversation was the first time that Plaintiff Thomas learned that Ms. Charles had filed a complaint against Plaintiff Thomas with the Inspector General and that it was being investigated by CGIS.

25.     Nonetheless, in order to avoid the appearance of retaliation and to comply with Vice Admiral Thomas's instruction, Plaintiff Thomas did not release the letter of reprimand that she had prepared for Ms. Charles.

26.     In or around the end of May 2024, CGIS investigators made an appointment to meet with Plaintiff Thomas to discuss Ms. Charles's complaint. At this meeting, Plaintiff Thomas learned for the first time that Ms. Charles had accused Plaintiff Thomas of sexual assault in her CGIS complaint.

27.     At the time, Plaintiff Thomas did not know any of the details of Ms. Charles's allegations against Plaintiff Thomas.

28.     Ms. Underwood provided a statement to CGIS as part of its investigation into Ms. Charles's complaint, in which Ms. Underwood stated that Ms. Charles "weaponized" the SAPRR program for her own gain in order to avoid accountability.

29.     After CGIS completed its investigation into Ms. Charles's complaint, on or about July 1, 2024, Vice Admiral Thomas issued a Final Action Memorandum, stating that he was "taking no punitive action against RADM Thomas" and directing that the "matter be closed."

30.     After he issued the Final Action Memorandum, Vice Admiral Thomas revealed to Plaintiff Thomas the gist of Ms. Charles's allegations against her. Ms. Charles had alleged that,

during their one-on-one meeting in March, when Plaintiff Thomas broached the subject of suspected substance abuse and Ms. Charles had a breakdown, while attempting to console her, Plaintiff Thomas gave Ms. Charles a hug (which is true) and that, when they were walking down the hall together after the meeting, Plaintiff Thomas touched Ms. Charles's buttocks with her hand (which is false).

31.    Separately, in June 2024, Plaintiff Thomas learned that Ms. Underwood had filed an Anti-Harassment and Hate Incident ("AHHI") complaint against Ms. Charles. In her complaint, Ms. Underwood also alleged that Plaintiff Thomas, as Ms. Charles's Senior Rater, had not taken sufficient action to stop Ms. Charles's programmatic mismanagement and staff abuse. Plaintiff Thomas provided a statement to AHHI investigators in connection with this complaint on June 24, 2024.

32.    Plaintiff Thomas's departure from official duties on July 2, 2024 and retirement on September 1, 2024 had been planned two years in advance—long before Plaintiff Thomas confronted Ms. Charles about her performance issues and suspected substance misuse and before either Ms. Charles's sexual harassment complaint or Ms. Underwood's AHHI complaint had been filed.

33.    Prior to Plaintiff Thomas's departure from official duties in the Coast Guard on July 2, 2024, she left the letter of reprimand for Ms. Charles with Dr. Navarro, to be released once the investigations into both the complaint filed by Ms. Charles against Plaintiff Thomas and the AHHI complaint filed by Ms. Underwood had been completed.

34.    At the conclusion of the AHHI investigation into Ms. Underwood's complaint, Ms. Charles was removed from her position as the SAPRR Oversight & Policy Office Chief in or around August 2024.

**B.  Defendants operate a Facebook page called "The Pettiest Officer of the U.S. Coast Guard."**

35.    Defendants operate a Facebook page called "The Pettiest Officer of the U.S. Coast Guard."

36.    As of July 2025, "The Pettiest Officer of the U.S. Coast Guard" Facebook page had over 56,000 followers.

37.    As of July 2025, "The Pettiest Officer of the U.S. Coast Guard" Facebook page was public, so that anyone with a Facebook account could view its posts, regardless of whether they "followed" the page.

38.    On its Facebook page, The Pettiest Officer described itself as a "resource for survivors [of sexual assault] seeking assistance." Its purported mission is to expose sexual predators within the Coast Guard and to provide a platform for "survivors" to tell their stories anonymously.

39.    According to the Nevada Secretary of State's website, Defendant Carrier is a managing member of Defendant The Pettiest Officer.

40.    Upon information and belief, Defendant Carrier operates "The Pettiest Officer of the U.S. Coast Guard" Facebook page from his home in Leominster, Massachusetts.

41.    Upon information and belief, Defendant Carrier uses the anonymity of "The Pettiest Officer of the U.S. Coast Guard" Facebook page to make unfounded and knowingly false accusations against current and former members of the Coast Guard.

42.    Upon information and belief, Defendant The Pettiest Officer is the alter ego of Defendant Carrier.

**C.  Defendants published false and defamatory statements about Plaintiff Thomas on their Facebook page.**

43.    On August 20, 2024, Defendants posted on "The Pettiest Officer of the U.S. Coast

Guard" Facebook page that they "have received numerous reports regarding alleged sexual abuse and medical malpractice by Coast Guard Medical Personnel[.]" (Ex. 1) The August 20 Facebook post was "seeking specific information regarding a Commissioned Corps of the U.S. Public Health Service FLAG OFFICER who is currently assigned to the U.S. Coast Guard. We have information indicating that this person served as a medical officer aboard the United States Coast Guard Barque EAGLE within the past few weeks[.]" (Ex. 1) The August 20 Facebook post also referred to this individual as an "admiral." (Ex. 1)

44.    Upon information and belief, Plaintiff Thomas was the only "medical officer aboard the United States Barque EAGLE" during summer 2024 who was also an admiral and "a Commissioned Corps of the U.S. Public Health Service FLAG OFFICER … assigned to the U.S. Coast Guard."

45.    Upon information and belief, Defendants' August 20 Facebook post was referring to Plaintiff Thomas.

46.    The August 20 Facebook post stated that "this admiral has sexual assault complaints against them." (Ex. 1)

47.    Upon information and belief, Ms. Charles assisted, encouraged, and/or acted in concert with Defendants in making the August 20 Facebook post in retaliation for Plaintiff Thomas confronting Ms. Charles about her performance issues and suspected substance abuse disorder.

48.    On May 5, 2025, Defendants posted on "The Pettiest Officer of the U.S. Coast Guard" Facebook page that Plaintiff Thomas was a "listed suspect in multiple unrestricted sexual assault reports by subordinates throughout her career, spanning decades. Some cases against her still remain pending to date." (Ex. 2) Defendants included four photographs of Plaintiff Thomas

in the post. (Ex. 2)

49.    The May 5 Facebook post received nearly 600 reactions and 65 comments and was shared 44 times. (Ex. 2)

50.    The May 5 Facebook post was shared in the US Coast Guard Veterans Facebook group, which has over 28,000 members. The post was subsequently deleted from this group.

51.    The next day, May 6, 2025, Defendants posted on "The Pettiest Officer of the U.S. Coast Guard" Facebook page that The Pettiest Officer had "filed a formal complaint" with the Virginia Department of Health Professions ("DHP"), Enforcement Division "seeking the permanent revocation [sic] of Rear Admiral Thomas's license to practice medicine." (Ex. 3)

52.    The May 6 Facebook post repeated the statement from the May 5 post that Plaintiff "Rear Admiral Thomas is the subject of multiple restricted and unrestricted sexual assault reports filed by subordinates, some of which remain pending to date." (Ex. 3) The May 6 Facebook post further stated that Plaintiff "Rear Admiral Thomas has been in the Department Of Defense's CATCH program[4] for over a decade[.]" (Ex. 3)

53.    The May 6 Facebook post also included images of what purports to be a complaint submitted to DHP, with certain information redacted. (Ex. 3; Ex. 4)

54.    The "complaint" purportedly submitted to DHP lists the "person supplying information" as "The Pettiest Officer of the U.S. Coast Guard Organization." (Ex. 4)

55.    The "complaint" identifies Plaintiff Thomas, by name, as the "subject of report"

---

[4] The DoD CATCH a Serial Offender ("CATCH") Program became operational on August 5, 2019. *DoD Launches New Program to Catch Repeat Sexual Assault Offenders*, U.S. Army, (Aug. 6, 2019),
https://www.army.mil/article/225346/dod_launches_new_program_to_catch_repeat_sexual_assault_offenders. It allows sexual assault victims to anonymously disclose suspect and incident information to help the DoD identify serial offenders.  *Id.*

and includes her medical license number. (Ex. 4)

56.    The images of the "complaint" posted to "The Pettiest Officer of the U.S. Coast Guard" Facebook page redacted all information provided in the "patient information" section of the form. (Ex. 4)

57.    The "complaint" purportedly submitted to DHP falsely states, "Rear Admiral Dana L. Thomas drugged me before [redacted] on [redacted]th, 20[redacted] in Washington, DC. They [sic] initiated unwanted touching of a sexual nature, then I lost consciousness partially. … I can recall participating in sexual acts against my will." (Ex. 4)

58.    The "complaint" further falsely states that "Rear Admiral Thomas is currently the subject of multiple unrestricted sexual assailt [sic] reports received by the U.S. Coast Guard" and that the "Suspect is registered in DOD CATCH program for sexual assault[.]" (Ex. 4)

59.    The May 6 Facebook post received over 200 reactions and 26 comments and was shared 37 times. (Ex. 3)

60.    Plaintiff Thomas learned of Defendants' May 5 and May 6 Facebook posts when her former colleague, then Chief Medical Informatics Officer, Commander Swati Singh, sent screenshots of the posts to her on May 8, 2025.

61.    On May 15, 2025, Plaintiff Thomas contacted DHP Enforcement seeking confirmation of whether the "complaint" against her was actually filed.

62.    On May 19, 2025, an intake manager from DHP Enforcement informed Plaintiff Thomas that, because complaints are kept confidential, they were "unable to confirm or deny the existence of a complaint." The intake manager further notified Plaintiff Thomas that, "whenever a complaint or report we receive results in a formal investigation, state law requires that we provide a copy of the complaint to the licensee/respondent. Please be assured that if a complaint

12

resulted in a formal investigation, you would be made aware of it and have an opportunity to respond."

63.     As of the filing of this Complaint, Plaintiff Thomas has not received any notice of a formal investigation by DHP Enforcement.

64.     The statements contained in the May 5 and May 6 Facebook posts, and in the images of the "complaint" to DHP, are false.

65.     To Plaintiff Thomas's knowledge, the only "report" of sexual assault that was ever made against her, in her thirty years of military service, was the false report made by Ms. Charles in 2024 in retaliation for Plaintiff Thomas attempting to hold her accountable for substandard leadership and recommending that she seek professional assessment once she acknowledged drinking more than usual. Far from the allegations in the DHP "complaint" regarding "drugging," "unwanted touching of a sexual nature," and "participating in sexual acts against [her] will," Ms. Charles's allegations against Plaintiff Thomas involved a hug and her hand purportedly coming into contact with Ms. Charles's buttocks (which was untrue).

66.     CGIS thoroughly investigated Ms. Charles's complaint in April through June 2024 and, on July 1, 2024, Vice Admiral Thomas directed that the matter be closed without taking any punitive action against Plaintiff Thomas.

67.     To Plaintiff Thomas's knowledge, as of May 5, 2025, there were no pending reports of sexual assault against her.

68.     To Plaintiff Thomas's knowledge, she is not registered in the DoD's CATCH program for sexual offenders, and certainly has not been so "for over a decade," as the program has only been in existence for six years.

69.     Upon information and belief, Ms. Charles is the "patient" who is the alleged

"victim" in the "complaint" purportedly submitted by Defendants to DHP.

### D. Defendants' false and defamatory statements caused reputational harm to Plaintiff Thomas.

70.     The Survivor Advocacy Network is a group that provides "healing, connection, advocacy, and education" to survivors of sexual assault who graduated from a military service academy. Plaintiff Thomas had previously been a guest speaker to this group as part of a two-day workshop in November 2024.

71.     Prior to Defendants' May 5 and May 6 Facebook posts, the Survivor Advocacy Network had invited Plaintiff Thomas to provide a presentation entitled "Survivorship, Service, Healing and Leading" to its members on June 10, 2025. The presentation was to consist of a two-hour discussion and small-group break-out session.

72.     In April 2025, the Survivor Advocacy Network broadly advertised to its members Plaintiff Thomas's upcoming presentation.

73.     Because of Defendants' false and defamatory statements about Plaintiff Thomas in the May 5 and May 6 Facebook posts, on May 8, 2025, the Survivor Advocacy Network cancelled Plaintiff Thomas's presentation scheduled for June 10.

74.     Also on May 8, 2025, Defendants publicized on "The Pettiest Officer of the U.S. Coast Guard" Facebook page the Survivor Advocacy Network's cancellation of Plaintiff Thomas's presentation. (Ex. 5) In the May 8 Facebook post, Defendants stated that the Survivor Advocacy Network "was unaware of the allegations against Thomas until they were brought to their attention by The Pettiest Officer Team." (Ex. 5)

75.     The May 8 Facebook post again repeated the false statement that Plaintiff "Thomas is the subject of numerous formal sexual assault complaints throughout her career as a medical officer, and some cases against her remain unresolved to this day." (Ex. 5)

76.    The May 8 Facebook post further stated that The Pettiest Officer Team had filed "an official complaint with the Commonwealth of Virginia's Department of Health Professions Enforcement Division … seeking the permanent revocation of Dana Thomas's license to practice medicine." (Ex. 5)

77.    The May 8 Facebook post included a photograph of Plaintiff Thomas. (Ex. 5)

78.    The May 8 Facebook post included links to the May 5 and May 6 Facebook posts. (Ex. 5)

79.    The May 8 Facebook post received over 3200 likes and 140 comments and was shared 117 times. (Ex. 5)

**E. Facebook temporarily deactivated "The Pettiest Officer of the U.S. Coast Guard" Facebook page.**

80.    In or around August 2025, after the false and defamatory posts about Plaintiff Thomas had been visible to the public for three months, Facebook temporarily deactivated "The Pettiest Officer of the U.S. Coast Guard" Facebook page, making it inaccessible to the public.

81.    Since being deactivated by Facebook, The Pettiest Officer has continued to post on its alternate pages and/or accountants, including "The Pettiest Officer" and "The Pettiest Officer Organization."

82.    On its alternate pages, The Pettiest Officer has stated its intention to get its "main page," i.e., "The Pettiest Officer of the U.S. Coast Guard" Facebook page, "republished."

83.    Upon information and belief, when "The Pettiest Officer of the U.S. Coast Guard" page is reactivated by Facebook, the false and defamatory posts about Plaintiff Thomas will once again be visible to the public.

**COUNT I – Defamation *Per Se***

**(Against All Defendants)**

15

84.     Plaintiff incorporates and restates the allegations in the foregoing paragraphs as if fully set forth herein.

85.     Defendants published the following false and defamatory statements about Plaintiff Thomas:

a.  On May 5, 2025, that Plaintiff Thomas was a "listed suspect in multiple
    unrestricted sexual assault reports by subordinates throughout her career,
    spanning decades. Some cases against her still remain pending to date." (Ex. 2);

b.  On May 6, 2025, that Plaintiff "Rear Admiral Thomas is the subject of multiple
    restricted and unrestricted sexual assault reports filed by subordinates, some of
    which remain pending to date." (Ex. 3);

c.  On May 6, 2025, that Plaintiff "Rear Admiral Thomas has been in the Department
    Of Defense's CATCH program for over a decade[.]" (Ex. 3);

d.  On May 6, 2025, that Plaintiff "Rear Admiral Dana L. Thomas drugged" an
    unnamed individual and "initiated unwanted touching of a sexual nature" (Ex. 4);

e.  On May 6, 2025, that Plaintiff "Rear Admiral Thomas is currently the subject of
    multiple unrestricted sexual assailt [sic] reports received by the U.S. Coast
    Guard" (Ex. 4);

f.  On May 6, 2025, that Plaintiff Thomas "is registered in DOD CATCH program
    for sexual assault[.]" (Ex. 4); and

g.  On May 8, 2025, that Plaintiff "Thomas is the subject of numerous formal sexual
    assault complaints throughout her career as a medical officer, and some cases
    against her remain unresolved to this day." (Ex. 5)

86.     Defendants identified Plaintiff Thomas as the subject of these false and

defamatory statements by using her full name, military rank, job title, and medical license number, as well as by including photographs of Plaintiff Thomas in the Facebook posts.

87.    Defendants published these false and defamatory statements about Plaintiff Thomas on their public Facebook page, which is visible to anyone with a Facebook account. Each post received between hundreds and thousands of "reactions" and, upon information and belief, was viewed by thousands more people who did not "react" to them.

88.    Defendants published these false and defamatory statements about Plaintiff Thomas with knowledge that they were false or acted in reckless disregard for the truth or falsity of these statements.

89.    As a result of Defendants' conduct, Plaintiff Thomas suffered damages, including but not limited to loss of reputation, personal humiliation, and mental anguish and suffering.

## COUNT II – Defamation *Per Quod*

### (Against All Defendants)

90.    Plaintiff incorporates and restates the allegations in the foregoing paragraphs as if fully set forth herein.

91.    Defendants published the following false and defamatory statements about Plaintiff Thomas:

 a.    On May 5, 2025, that Plaintiff Thomas was a "listed suspect in multiple unrestricted sexual assault reports by subordinates throughout her career, spanning decades. Some cases against her still remain pending to date." (Ex. 2);

 b.    On May 6, 2025, that Plaintiff "Rear Admiral Thomas is the subject of multiple restricted and unrestricted sexual assault reports filed by subordinates, some of which remain pending to date." (Ex. 3);

 c.    On May 6, 2025, that Plaintiff "Rear Admiral Thomas has been in the Department

17

Of Defense's CATCH program for over a decade[.]" (Ex. 3);

    d.   On May 6, 2025, that Plaintiff "Rear Admiral Dana L. Thomas drugged" an unnamed individual and "initiated unwanted touching of a sexual nature" (Ex. 4);

    e.   On May 6, 2025, that Plaintiff "Rear Admiral Thomas is currently the subject of multiple unrestricted sexual assailt [sic] reports received by the U.S. Coast Guard" (Ex. 4);

    f.   On May 6, 2025, that Plaintiff Thomas "is registered in DOD CATCH program for sexual assault[.]" (Ex. 4); and

    g.   On May 8, 2025, that Plaintiff "Thomas is the subject of numerous formal sexual assault complaints throughout her career as a medical officer, and some cases against her remain unresolved to this day." (Ex. 5)

92.    Defendants identified Plaintiff Thomas as the subject of these false and defamatory statements by using her full name, military rank, and job title, and medical license number, as well as by including photographs of Plaintiff Thomas in the Facebook posts.

93.    Defendants published these false and defamatory statements about Plaintiff Thomas on their public Facebook page, which is visible to anyone with a Facebook account. Each post received between hundreds and thousands of "reactions" and, upon information and belief, was viewed by thousands more people who did not "react" to them.

94.    Defendants published these false and defamatory statements about Plaintiff Thomas with knowledge that they were false or acted in reckless disregard for the truth or falsity of these statements.

95.    As a result of Defendants' conduct, Plaintiff Thomas suffered damages, including but not limited to loss of reputation, personal humiliation, and mental anguish and suffering. In

particular, because of Defendants' Facebook posts, the Survivor Advocacy Network cancelled Plaintiff Thomas's presentation that had been scheduled for June 10, 2025. The false statements regarding accusations of sexual assault are particularly hurtful to Plaintiff Thomas given that she has dedicated her career to public service and, specifically, to aiding victims of sexual assault. Defendants' conduct has caused Plaintiff Thomas to suffer from sleeplessness, lack of appetite, increased anxiety, depression, and fear for her future. She has started seeing a therapist for treatment of these symptoms. Additionally, many of Plaintiff Thomas's colleagues, friends, and acquaintances viewed Defendants' false and defamatory statements about her, which caused Plaintiff Thomas severe embarrassment and humiliation.

## COUNT III –Intentional Infliction of Emotional Distress

### (Against All Defendants)

96.    Plaintiff incorporates and restates the allegations in the foregoing paragraphs as if fully set forth herein.

97.    Defendants' conduct in publishing the false and defamatory statements about Plaintiff Thomas was intentional and/or reckless.

98.    Defendants' conduct in publishing the false and defamatory statements about Plaintiff Thomas is outrageous, intolerable, atrocious, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

99.    As a result of Defendants' conduct, Plaintiff Thomas suffered severe emotional distress. Specifically, Plaintiff Thomas has suffered and continues to suffer from sleeplessness, lack of appetite, increased anxiety, depression, and fear for her future. She has started seeing a therapist for treatment of these symptoms.

100.    Plaintiff Thomas's emotional distress, caused by Defendants' conduct, is so severe that no reasonable person could be expected to endure it.

## COUNT IV –Preliminary and Permanent Injunction

### (Against All Defendants)

101.    Plaintiff incorporates and restates the allegations in the foregoing paragraphs as if fully set forth herein.

102.    Plaintiff Thomas has suffered and will continue to suffer irreparable harm and injury as a result of Defendants' conduct as alleged above, including but not limited to loss of reputation, personal humiliation, and mental anguish and suffering.

103.    There is no adequate remedy at law to protect Plaintiff Thomas from Defendants' unlawful conduct—namely, publishing false and defamatory sexual assault allegations against Plaintiff Thomas on its public Facebook page.

104.    Plaintiff Thomas is likely to succeed on the merits of her claims.

105.    The balance of hardships tips in favor of granting the injunction, as the harm to Plaintiff Thomas outweighs the burden that the injunction would place on Defendants.

106.    Granting an injunction is in the public interest because the public interest is not served by allowing Defendants to publish false and defamatory sexual assault accusations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Thomas respectfully requests that this Court

a.  grant an immediate preliminary and permanent injunction in favor of Plaintiff Thomas and against Defendants

  i.  enjoining Defendants from publishing, on any Facebook page, website, or any other forum, any further statements referring to or referencing Plaintiff Thomas;

  ii.  ordering Defendants to delete the August 20, May 5, May 6, and May 8 Facebook posts concerning Plaintiff Thomas;

      iii.    ordering Defendants to post on their Facebook pages a retraction of the false and defamatory statements made in their August 20, May 5, May 6, and May 8 Facebook posts; and

      iv.    ordering Defendants to withdraw the complaint filed against Plaintiff Thomas with DHP;

b.   enter judgment against Defendants for general damages in an amount to be determined at trial, but not less than $75,000.00, plus interest;

c.   enter judgment against Defendants for special damages in an amount to be determined at trial, but not less than $75,000.00, plus interest;

d.   enter judgment against Defendants for compensatory damages in an amount to be determined at trial, but not less than $75,000.00, plus interest;

e.   enter judgment against Defendants for punitive damages in an amount to be determined at trial, but not less than $75,000.00, plus interest;

f.   award Plaintiff Thomas costs and reasonable attorneys' fees; and

g.   order such other and further relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a jury trial as to all claims so triable.

Dated: October 27, 2025

Respectfully submitted,

/s/

_____

Timothy F. Maloney (*pro hac vice* forthcoming)
tmaloney@jgllaw.com
Kaitlin E. Leary (*pro hac vice* forthcoming)
kleary@jgllaw.com
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301-220-2200

Charles B. Molster, III (Virginia Bar No. 23613)
The Law Offices of Charles B. Molster, III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, D.C. 20007
cmolster@molsterlaw.com
202-787-1312

*Counsel for Plaintiff*